UNITED STATES of America,
Plaintiff–Appellee,

v.

Jackie Lynn WESTMORELAND,
Defendant–Appellant.

No. 91–6153.

United States Court of Appeals,
Sixth Circuit.

Argued March 24, 1992.

Decided Sept. 10, 1992.

---

Ed Holt, Asst. U.S. Atty. (argued and briefed) and Jerry G. Cunningham, U.S. Atty., Office of the U.S. Atty., Knoxville, Tenn., for plaintiff-appellee.

Ronald P. Smith (argued and briefed), Knoxville, Tenn., for defendant-appellant.

Before: KENNEDY and SILER, Circuit Judges; and ENGEL, Senior Circuit Judge.

KENNEDY, Circuit Judge.

Defendant Westmoreland appeals from the District Court's order denying his post-conviction motion asking for sentence credit for the time spent at a halfway house and in a residential substance abuse program prior to sentencing. The District Court denied the motion, holding that the time spent at the institutions did not amount to official detention under 18 U.S.C. § 3585. We now REVERSE that decision and REMAND to the District Court with instructions to dismiss the motion for lack of jurisdiction.

At the time of the District Court's decision, the law of this Circuit provided that applications for sentence credits should be made to the District Court. *United States v. Wilson*, 916 F.2d 1115 (6th Cir.1990), rev'd, —— U.S. ——, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992). In reversing *Wilson*, the Supreme Court held that a district court does not have jurisdiction to apply credit against a sentence under section 3585(b). Rather, the Attorney General,

through the Bureau of Prisons, is to make that determination. Review of the Bureau of Prisons' determination is available through the administrative process and ultimately, after the exhaustion of administrative remedies, in the District Court.

 In asking that we review a decision denying Westmoreland sentence credit, defendant asks us to review a decision the District Court was not authorized to make. The parties recognize this, but because of the unusual posture of the case, the government has agreed to waive the requirement of exhaustion of administrative review. This waiver, the parties urge, will permit us to review the District Court's decision. We disagree, and find the issue not ripe for decision when it was presented to the District Court.

In *Wilson*, the Supreme Court expressly stated that 18 U.S.C. § 3585(b) does not authorize a district court "to award credit at sentencing," and that the Attorney General "must continue to compute the credit under § 3585(b) as he did under the former § 3568." —— U.S. at ——, 112 S.Ct. at 1354. For the District Court to make the initial determination, it would have to be acting pursuant to some sort of delegation of authority from the Attorney General, clearly impermissible for an Article III court. For the district court to perform its constitutional functions, it must decide an actual case or controversy ripe for adjudication. There can be no such case or controversy until the Attorney General makes a determination and Westmoreland then seeks judicial review of the determination.[1]

 We recognize that the Tenth Circuit in *United States v. Woods*, 888 F.2d 653 (10th Cir.1989), *cert. denied*, 494 U.S. 1006, 110 S.Ct. 1301, 108 L.Ed.2d 478 (1990), permitted such a waiver of the Attorney General's decision, but the authorities on which it relied were all cases where a decision had been made and the waiver was of administrative appeal requirements. The doctrine of waiver of exhaustion of administrative review is not relevant to this case, where

---

1. If the Attorney General should fail to make such determination, defendant could require he do so by mandamus, but that circumstance is not alleged to exist here. In addition, if the credit exceeded the sentence, habeas corpus relief would be available.

the agency has not issued a decision. Although an agency may waive the opportunity to change its mind, it may not waive (and thereby delegate to the district court) the responsibility to make up its mind in the first place. Until the Attorney General makes a sentence credit determination under section 3585(b), the case is not ripe for review by the District Court.

Accordingly, the order of the District Court denying sentence credit is REVERSED and the action is REMANDED to the District Court with instructions to dismiss the motion for want of jurisdiction.

ENGEL, Senior Circuit Judge, dissenting.

I respectfully dissent from the majority's determination that the doctrine of ripeness should preclude our reaching the merits of this appeal. I believe an Article III case or controversy exists, and that the prudential concerns of the ripeness doctrine strongly favor reaching a decision on the merits here. See generally, Buckley v. Valeo, 424 U.S. 1, 117, 96 S.Ct. 612, 681, 46 L.Ed.2d 659 (1976) ("this is a question of ripeness, rather than lack of case or controversy under Article III."); CHARLES WRIGHT, ARTHUR MILLER & EDWARD COOPER, FEDERAL PRACTICE & PROCEDURE § 3532.1 (1984) (discussing dual nature of ripeness).

When Westmoreland first sought presentence credit from the district court our circuit's decision in United States v. Wilson, 916 F.2d 1115 (6th Cir.1990), was still good law. On the very day in which oral arguments were held in this appeal, however, the Supreme Court, in a 7–2 opinion authored by Justice Thomas, reversed our circuit's decision in Wilson and concluded that the Attorney General had the same power to compute such credit under section 3585(b) as the Attorney General had under the predecessor statute, 18 U.S.C. § 3568 (1962). United States v. Wilson, —— U.S. ——, 112 S.Ct. 1351, 117 L.Ed.2d 593 (1992). Under those circumstances, we requested the advice of the parties as to the effect upon the instant appeal of the Supreme Court's decision.

In a letter brief, the United States expressly waived any right it might have to insist that the Attorney General initially determine the credit, citing United States v. Woods, 888 F.2d 653 (10th Cir.1989), cert. denied, 494 U.S. 1006, 110 S.Ct. 1301, 108 L.Ed.2d 478 (1990). Woods held that the defendant's failure to exhaust administrative remedies did not preclude judicial review where the government had failed to interpose an objection in a timely way in the district court. While the decision of another circuit on this question does not bind us, the letter brief clearly evidences the government's affirmative desire, in these proceedings, that our circuit decide the underlying issue of what constitutes official detention, a desire equally shared by the defendant. As the government points out, jurisdiction ultimately to review the questions presented here is not seriously in doubt, although the wisdom of our doing so at this stage is admittedly troublesome. Both the majority and minority opinions in the Supreme Court's decision in United States v. Wilson observe that the normal and preferred course would see this particular question not addressed at the time of sentencing by the district judge, but left to the initial administrative decision by the Attorney General as it impacts upon the defendant's post-sentence time:

> After Congress enacted section 3568 in 1966, the Bureau of Prisons developed detailed procedures and guidelines for determining the credit available to prisoners. See Apps. B and C ...; see also United States v. Lucas, 898 F.2d 1554 (CA 11 1990). Federal regulations have afforded prisoners administrative review of the computation of their credits, see 28 C.F.R. §§ 542.10–542.16 (1990); Lucas, supra, at 1557, and prisoners have been able to seek judicial review of these computations after exhausting their administrative remedies, see U.S. v. Bayless, 940 F.2d 300, 304–05 (CA 8 1991); and other cases cited therein.

Wilson, —— U.S. at ——, 112 S.Ct. at 1355. The employment of administrative remedies as a condition for judicial relief not only reduces the expense and load upon the court system but normally allows the ulti-

mate decision to be made upon a better, more reliable record. In addition, Justice Thomas noted that all too frequently the exact calculation of pre-sentence credits will not be possible at the time of sentencing:

> Federal defendants do not always begin to serve their sentences immediately.... Because section 3585(b) bases the credit on how much time a defendant "has spent" (not "will have spent") prior to beginning his sentence, the District Court could not compute the amount of the credit at sentencing.·

*Wilson*, —— U.S. at ——, 112 S.Ct. at 1354. I thus agree that normally the proper procedure would be to do just what the majority has done here: require the criminal defendant to exhaust his remedies before repairing to court relief. I do not, however, see this as an absolute jurisdictional stricture which cannot be waived in a proper case, and this is exactly a proper case for waiver.

All of the arguments favoring ripeness are present here and in fact the district court made that express determination. Both parties fully addressed the issue and the district court fully considered them. They have been fully briefed in our court and our judges have heard oral argument on the merits of the issue raised. A full and complete factual record was made and documented in the district court and has been presented and considered by us. Unlike many such cases, the amount of time to be calculated is already determined and is no longer uncertain. To require Westmoreland's petition to be dismissed without decision either by the district court or by our court at this stage represents a great waste of energy both for the government, for the defendant and his counsel and for our court, a waste which can only be justified if it is absolutely required by law or if important policy considerations outweigh our interests in the efficient administration of justice. Not surprisingly, Westmoreland wants to know when he can get out and how his sentence is going to be affected by the time he spent in detention. Most important, it is evident that the Attorney General, for whose benefit and convenience

the statute appears to have been crafted and who has statutory responsibility for administering the U.S. Bureau of Prisons, is not only willing but anxious to have the issues on appeal here decided in a judicial way. This is not surprising. The issues often recur and there is a need for a reliable, precedential application of the statutory language to factual situations such as those presented here. Finally, it cannot fairly be said·of either party that this appeal results from connivance or forum-shopping for at the time the motion was filed both parties could honestly conclude that they were acting in obedience to the law of this circuit. Finally, as nearly all of the cases cited in Justice Thomas' opinion hold, the issue is one which is inevitably subject to judicial review. To me, at least, the question is, in the words of Justice Stevens, "whether the administration of justice would be better served by insisting on exhaustion or by reaching the merits of the petition forthwith." *Granberry v. Greer*, 481 U.S. 129, 131, 107 S.Ct. 1671, 1673, 95 L.Ed.2d 119 (1987). As to the ripeness argument, I would hold that the circumstances of this case above cited fully meet the requirements of ripeness articulated in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967), and argue strongly for our exercise of discretion to acquiesce in the government's willingness to waive·exhaustion. I therefore see this case (as do both parties here) as one in which the issue is not of the power of the federal courts to reach the ultimate question, which undoubtedly exists, but whether the Attorney General, who has the authority to promulgate the guidelines and regulations and has direct responsibility for the operation of the Bureau of Prisons, can in the unusual circumstances presented here, waive the exhaustion requirement.

I respectfully suggest that the majority here has overread the impact of the Supreme Court's decision in *Wilson* in much the same way as many circuits overread the holding in *Rose v. Lundy*, 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), that district courts should dismiss state habeas

corpus petitions which contained both exhausted and unexhausted claims. The confusion which followed *Rose v. Lundy* was largely removed by *Granberry v. Greer, supra,* which held basically that "although there is a strong presumption in favor of requiring the prisoner to pursue his available state remedies, his failure to do so is not an absolute bar to appellate consideration of his claims." *Id.* at 131, 107 S.Ct. at 1673. The intermediate position followed by Justice Stevens and a unanimous court was to recognize the legal authority of the courts of appeals to reach the merits of the habeas petition and to leave to them the question of whether comity and judicial efficiency might make it appropriate for the court to insist upon exhaustion before undertaking any review. *Id.* at 135, 107 S.Ct. at 1675. This being a federal prisoner case provides in my judgment even stronger support for a similar rule here. We need not look to a state forum for guidance on the administrative and legal questions presented here for they are completely federal in nature. In fact, federal courts should be more reluctant to intervene in cases with incomplete state proceedings. CHARLES WRIGHT, ARTHUR MILLER & EDWARD COOPER, FEDERAL PRACTICE & PROCEDURE, 203 (1984). It seems to me therefore that the majority has simply erred here as did the Seventh Circuit in *Granberry* by concluding that we were without judicial power to reach the merits of this dispute.

Having said so much I would, therefore, reach the merits of this case as requested by both parties. In so doing I would reverse the decision of the district court and remand for entry of an order, applicable to this case only, that Westmoreland was entitled to at least some of the presentence credits which he has sought.

## I.

What constitutes "official detention" within the meaning of section 3585(b) was not directly addressed by the Supreme Court in *Wilson.* That specific question has been addressed, however, by other circuits and, most important, by our own circuit recently in *United States v. Becak,* 954 F.2d 386, 388 (6th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 2286, 119 L.Ed.2d 211 (1992). *See Moreland v. United States,* 968 F.2d 655 (8th Cir.1992) (*en banc*); *Mills v. Taylor,* 967 F.2d 1397 (9th Cir. 1992); *United States v. Edwards,* 960 F.2d 278 (2d Cir.1992); *Pinedo v. United States,* 955 F.2d 12 (5th Cir.1992); *United States v. Zackular,* 945 F.2d 423 (1st Cir.1991); *United States v. Insley,* 927 F.2d 185 (4th Cir.1991); *United States v. Woods,* 888 F.2d 653 (10th Cir.1989). Because the circumstances in this case differ substantially from those of *Becak* and because the Supreme Court has since clarified the important role of the Attorney General in the decisional process, I do not believe we should hold ourselves wholly bound by *Becak,* at least where those circumstances are substantially different. I turn first to the stipulated facts before the district court and in this appeal.

On February 21, 1991, a grand jury indicted Jackie Westmoreland for burglary of a bank in violation of 18 U.S.C. § 2113(a). On March 1, 1991, the district court ordered Westmoreland freed on a conditional bond. Among other conditions, the court required Westmoreland to "reside at Midway Rehab[ilitation] Center and undergo a medical exam there" and to "submit to drug counseling, which may include in-patient treatment for substance abuse."

Midway Rehabilitation Center ("Midway") is a halfway house in Tennessee. The Bureau of Prisons classifies Midway as a Level I facility, using it to house both convicted and non-convicted persons alike. Westmoreland spent a total of seventy-eight days in the Midway facility, divided into three separate stays.

Westmoreland's first stay in Midway lasted eighteen days, ending when he left to participate in the residential substance abuse program at the Detoxification Rehabilitation Institute ("DRI"). Westmoreland underwent twenty-eight days of treatment, and could not leave the facility at any time during his stay. When Westmoreland completed the program, he spent three days in Midway until the court released him to his

mother's custody. Westmoreland's taste of freedom was to be short-lived; about one month later, the authorities arrested Westmoreland for public intoxication.

After this new arrest, the court revised the conditions of Westmoreland's release. The court ordered Westmoreland "placed in the Midway Rehabilitation Center, under house arrest, where he shall be subject to intensive rehabilitation for his initial two–(2) week confinement." After the two weeks, the court ordered Westmoreland to remain at Midway and to be evaluated for another detoxification treatment program. Westmoreland remained in Midway under this order for another fifty-seven days, until the court revoked his bond due to his abusive treatment of the Midway staff.

At sentencing, Westmoreland requested 106 days credit towards his sentence for the time he spent in Midway and DRI. He asserted that he had been under "official detention" according to the terms of 18 U.S.C. § 3585(b). Section 3585(b) provides:

A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences—

(1) as a result of the offense for which the sentence was imposed; or

(2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed;

that has not been credited against any other sentence.

18 U.S.C. § 3585(b). The district court denied Westmoreland the credit, finding that he had not been under "official detention." This appeal followed.

## II.

Congress enacted 18 U.S.C. § 3585 as part of the Sentencing Reform Act of 1984. Section 3585(b) requires the Attorney General to grant sentencing credit for time spent in "official detention." Eight years after its enactment, the scope of this term remains unsettled.

As noted earlier, our court has addressed this question in the recent *Becak* case. Ap-plication of the language in *Becak* to the facts here poses some difficulty, however, because two different approaches, harmonious within *Becak*, present tension when applied to Westmoreland's case. *Becak* states, "[w]e find no reason to depart from our prior precedent that requires physical incarceration to receive credit for presentence detention." *Becak* 954 F.2d at 387. *See Marrera v. Edwards*, 812 F.2d 1517 (6th Cir.1987) (section 3568 "custody" requires physical incarceration). The same paragraph continues to equate the term "official detention" with section 3568's use of the term "in custody." The language of *Becak* seems to conclude that a bright line can be drawn and that a defendant is either released or detained and that therefore conditional releases are not and may never amount to detention. *Id.* *Becak*'s citation with approval of both *United States v. Woods*, 888 F.2d 653 (10th Cir.1989), and *United States v. Insley*, 927 F.2d 185 (4th Cir.1991), solidifies this interpretation because language in both cases indicates that "in custody" must be identical to "official detention" and that only physical incarceration can meet the requirements for sentencing credits under section 3585. *See also Randall v. Whelan*, 938 F.2d 522 (4th Cir. 1991) (*Insley* precludes credit regardless of the "degree of restraint" involved in release). Further, the Fifth Circuit has read *Becak* this way. *See Pinedo v. United States*, 955 F.2d 12, 13–14 (5th Cir.1992). Thus, this portion of *Becak* would seem to foreclose every avenue for granting Westmoreland credit short of absolute and formal imprisonment.

Yet, in its concluding dispositive provisions, the panel in *Becak* stopped short of adopting the highly restrictive approach of *Woods* and *Insley*. The last paragraph of *Becak* observed:

We hold that sentence credit shall be granted under section 3585 for "official detention" under conditions *equivalent* to physical incarceration. We find that defendant's release subject to certain restrictive conditions did not rise to the level of "official detention." (emphasis added)

*Becak,* 954 F.2d at 388. Similarly, the First Circuit's interpretation of section 3585 in *United States v. Zackular,* 945 F.2d 423, 425 (1st Cir.1991), allows for the possibility that confinement could be "the equivalent of immurement" and so "within the ambit of 'official detention.'" These interpretations implicitly find some significance in the statutory change from "in custody" to "official detention," a position which finds some solace in the recent *Wilson* opinion. *Wilson* also perceived a difference between the two statutes:

> Our interpretation of § 3585(b), however, does not render the 1987 revision meaningless. Congress altered § 3568 in at least three ways when it enacted § 3585(b). First, Congress replaced the term "custody" with the term "official detention."

*Wilson,* —— U.S. at ——, 112 S.Ct. at 1355. Thus, Justice Thomas's finding of a distinction appears to be at odds with the language in *Becak, Woods, Insley, Pinedo, Mills* and *Moreland,* all of which find the change in terminology of no consequence. It is not certain from what follows in *Wilson,* however, that the Supreme Court had in mind that the changes in language, though of consequence, were intended to enlarge the class of defendants eligible to receive credit under this section. Certainly no effort was made to define the terms, although *Wilson* recognizes that the Bureau of Prisons has developed detailed procedures and guidelines for determining credit available to prisoners. *Id.*

The Supreme Court's opinion in *Wilson* observed that after Congress enacted section 3568, the Bureau of Prisons developed detailed procedures and guidelines for determining the credit available, citing with favor *United States v. Lucas,* 898 F.2d 1554 (11th Cir.1990), wherein it is recognized that the Attorney General had specifically delegated his authority to the Bureau of Prisons. *See* 28 C.F.R. § 0.96 (1989). Since the enactment of section 3585, the Bureau of Prisons has revised those guidelines. Of particular interest is the following paragraph:

> A defendant is not eligible for any credits while *released* from detention. Time spent in residence in a community corrections center as a result of the *Pretrial Services Act of 1982* (18 USC § 3152–3154), or as a result of a condition of bail or bond (18 USC § 3141–3143), is not creditable as presentence time. A condition of bail or bond which is "highly restrictive," and that includes "house arrest", "electronic monitoring" or "home confinement"; or such as requiring the defendant to report daily to the U.S. Marshal, U.S. Probation Service, or other person; is not considered as time in official detention. Such a defendant is not subject to the discretion of the U.S. Attorney General, the Bureau of Prisons, or the U.S. Marshals Service, regarding participation, placement, or subsequent return to a more secure environment, and therefore is not in a status which would indicate an award of credit is appropriate (see *Randall v. Whelan,* 938 F2d [sic] 522 (C.A. 4, 1991) and *U.S. v. Insley,* 927 F.2nd [sic] 185 (C.A. 4, 1991)). Further, the government may not prosecute for escape in the case of an unauthorized absence in such cases, as the person has been lawfully *released* from "official detention".
>
> Official detention does not include any time in a release status when the defendant is considered "in custody" for purposes of pursuing a habeas corpus petition with the court, as cited by the U.S. Supreme Court in *Hensley v. Municipal Court,* 411 U.S. 345[, 93 S.Ct. 1571, 36 L.Ed.2d 294] (1973) (see also *Cochran v. U.S.,* 489 F.2d 691 (C.A. 5, 1974); *Villaume v. United States,* 804 F.2d 498 (C.A. 8, 1986) (per curiam), *cert. denied,* 481 U.S. 1022[, 107 S.Ct. 1908, 95 L.Ed.2d 514] (1987)).

Bureau of Prisons, Program Statement 5880.28, page 1–15–1–16 (Feb. 1992).

In the usual course, appellate courts should pay great deference to the calculations made by the Attorney General to determine sentencing credit under the aforementioned Bureau of Prisons Guidelines. See *Moreland,* 968 F.2d at 658 (deferring to Bureau of Prisons regulations for § 3568). Nonetheless, the method of

calculation and a determination whether that method conforms to the statutory definition of "official detention" must in the final analysis be subject to our review *de novo.* So much appears to have been the conclusion of Circuit Judge Krupansky in our circuit's decision in *U.S. v. Wilson,* 916 F.2d at 1117. Nothing in the reversal of that decision by the Supreme Court bears upon this particular aspect of the appeal. Further, if as all agree, the law entitles a defendant at some stage to a meaningful review, that review must address the standards which the Attorney General has used.

As a basis for its policy, the Bureau of Prisons cites *Insley,* as our court did in *Becak.* Both *Insley* and, significantly, *Becak* involved restrictions on liberty far less oppressive than those the court placed on Westmoreland. Insley lived at home with her parents, free to seek employment and travel to work and church, although she did have to submit to drug testing. Likewise, Becak had to live with his mother and could leave only for work. While the courts' conditions of release restricted both in the hours they could spend away from their parents' homes, neither's "detentional" setting approached the quality of a traditional penalogical setting.

In contrast, the court released Westmoreland to a Level I Bureau of Prisons facility. According to the parties' stipulations:

> During all times that the Defendant [Westmoreland] was a resident of the Midway Rehabilitation Center he was on "punitive status." Records from Midway indicate that he remained on premises at all times, excepting one occasion where he was permitted to go to church for a period of two hours; one occasion where he was permitted to go to the Salvation Army to buy clothing; and several occasions when he was permitted to visit his lawyer. Twice a week the Defendant was permitted to attend AA meetings. For the remainder of the time, the Defendant remained inside the Midway Rehabilitation Center, excepting two 15 minute periods every day where

> he was allowed to go on the porch of the center to smoke a cigarette.

> ... [Westmoreland] was not permitted any work release privileges, [and] was required to attend individual and group counseling sessions once each week. His mother was permitted to visit him at the center four hours per week.

The court forced Westmoreland to live under these conditions, which certainly approach those of a traditional penalogical setting, for seventy-eight days.

Bureau of Prisons regulations, however, do not consider these large differences in restrictions on individual freedom. Therefore, I would hold these regulations to be inadequate to the decisional task vested in the Bureau of Prisons by the Attorney General and as contemplated by Congress' statutory scheme. While no doubt the plan has advantages of convenience for the Bureau of Prisons and the Department of Justice, it lacks sensitivity toward the actual amount of restraint placed upon a presentence detainee awaiting trial, in contravention of our understanding of the statutory plan. Congress promulgated the Sentence Reform Act in order to circumscribe the conditions whereby persons awaiting trial were permitted freedom. Congress was reacting to the long record of delays in coming to trial and public outrage over cases in which criminal defendants awaiting trial continued to prey upon the public. At the same time, the statute deals with human freedom, even though it is that of a person accused of crime and awaiting trial on serious charges.

The dilemma facing the courts, the Attorney General, and the Bureau of Prisons in balancing these interests in individual liberty and public safety is understandable. Yet, equating the quality of detention with the "place" of detention is simply not an altogether satisfactory method for achieving the proper balance. I agree with *Insley, Becak* and other cases which hold that in nearly all cases, a release on bond conditioned upon the requirement that the defendant reside at the home of a relative or another private home can hardly be viewed as the kind of detention which Congress

contemplated as giving rise to credit against a sentence of imprisonment. Likewise I agree with those circuits which hold that a halfway house as a place of confinement is not normally so constricted as to be the equivalent of a penalogical institution in the normal sense whereas a jail and a prison of course is. The wide range of circumstances in which pretrial confinement can take place, reflecting a flexibility which is highly compatible with public policy, can result in as many variant fact situations as there are places of confinement, as demonstrated here.

Thus, a "bright line rule" limited solely to an examination of the place of confinement, rather than to the conditions of that confinement, does not fit with the statutory framework governing computation of presentence credits. The normal descriptive terms of institutions or places of confinement do not provide guides for the application of administrative rules promulgated in an effort to carry out the intent of this statute. The situation is not unlike the dilemma which faced the courts years ago in the field of searches and seizures until it was realized in *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967), that the Fourth Amendment "protects people and not places" and that limitations upon the freedoms of that amendment had to be analyzed in terms of individuals rather than their physical environment. Good sense says that a similar approach here is most likely to produce the most salutary application of the statute from the point of view both of the interests of the United States and of persons accused of crime within the criminal justice system.

In expansion of the foregoing ideas, I would hold that the best definition of "official detention" under the statute looks realistically to the restraints and limitations upon the defendant and measures them against those usually and normally found in a formal institutionalized penalogical setting. Mere nomenclature in this post–1984 world of thinkspeak will simply not suffice. Nor does it really matter to a defendant whether the state, federal or local government owns or funds a particular place of confinement or, I might add, whether it is at the direction of the attorney general or of a court magistrate administering the statutory provisions of a pretrial release program. Likewise, it is relatively unimportant that the confinement may be a conditional one and granted only upon the execution of a bond to be enjoyed even though this may be the alternative to some more formal penalogical institution. Certainly within institutions themselves are widely variant degrees of confinement varying from time in administrative segregation, often in "the hole," on the one hand to trustee status, wherein limited temporary release from a prison is allowed for the purpose of education, treatment or rehabilitation.

A definition of "official detention" must also include the court's purpose in restricting the individual's freedom. As noted above, Congress placed restrictions on a defendant's ability to be released on bail out of concern for public safety. Restrictions placed on an accused simply for public protection, rather than aimed at helping the detainee, must be viewed as punitive, and therefore when combined with restrictions equivalent to physical incarceration constitute "official detention." Under these circumstances and in the absence of any other rational guideline which would suffice to provide a better or more reasoned administrative judgment, I believe that Westmoreland's time at Midway on "punitive status" should be credited by the Bureau of Prisons against the time ultimately imposed under this sentence.

In contrast, when the court releases a pretrial detainee to attend a drug or alcohol rehabilitation program, punishment and public safety do not usually enter the equation. This falls more along the lines of "self-help," and would be outside of the twin concerns of Congress in section 3585. So, while the opportunity to participate in the program may have been triggered by criminal charges, the treatment itself is but a consequence of a felt need by the defendant himself for this treatment, much as would be the case in any other hospital setting in which some restraints would nor-

mally be expected because of the necessity of treatment under the program and the best welfare of the patient. In such circumstances it could probably be fairly said that such treatment was not penalogical in its motive and therefore would not normally be expected to require a grant of credit for time so spent, nor would it be required here.

Finally, I must observe that the guidelines promulgated by the Bureau of Prisons have not been required to undergo the rigorous scrutiny which normally attends the publication of formal regulations and I therefore believe we need not treat them with that degree of deference, although I readily accept the fact that the experience of the Bureau and the Attorney General in this regard is entitled to great respect, as do the other circuits. Nor would I require that there be formal promulgation with the requirements of publication and the like. I do believe, however, that for greater deference to be given, a deference which would be persuasive at least to us, the Bureau should deal realistically with the substantive problem intended by Congress if it wishes to apply mechanical rules for ascertaining whether given physical circumstances amount to "official detention." In the absence of more sensitive guidelines which are compatible with the legislative purpose, I would hold ad hoc for the purpose of this case that the time spent in Midway here is to be credited by the Attorney General toward the time under the sentence whereas that time spent in the rehabilitation center need not.

I would therefore remand to the district court with instructions to grant Westmoreland's petition to the extent expressed herein.